RILEY, Administrator, Plaintiff, vs. CHICAGO & NORTH WESTERN RAILWAY COMPANY, Defendant: SANDERS and another, Impleaded Defendants.    [Two appeals.]

*June 6—July 12, 1949.*

174

*B. W. Huiskamp,* attorney, and *Frank A. Ross* of counsel, both of Madison, for the plaintiff.

*John E. Krueger* of Milwaukee, for the defendant.

For the impleaded defendant American Casualty Company there was a brief by *George McD. Schlötthauer,* attorney, and *C. G. Mathys* of counsel, both of Madison, and oral argument by *Mr. Mathys.*

ROSENBERRY, C. J.   As already stated, the accident occurred on the 17th day of March, 1947, at about 6:50 o'clock in the morning.   William C. Riley, the father of Alice R. Thompson, deceased, and administrator of her estate, was an eyewitness of the accident.   The material facts to which he testified in substance are as follows:

I am fifty years old.   I am also the administrator of the estate of William Allen Thompson, who was my daughter's husband, and guardian of William Allen Thompson, Jr., my grandson.   My house is the third house from Commercial avenue on the east side of Superior street.   At the time of the accident I was employed at the Celon Company about a mile from my home as night watchman.   I got home a little after 6 that morning.   William and Alice were up at that time. My property backs right up against the railroad right of way. I took out some rubbish which I burned in the ditch.   While I was burning the rubbish I saw William and Alice as they passed by me.   They came out of the house and through the gate and over the ditch.   They were going to their truck which was parked about one hundred feet from where I was burning my paper.   It was parked in the railroad roundhouse parking lot.   The railroad parking lot was east of the railroad tracks and the truck was parked about one hundred feet south of Commercial avenue.   Bill and Alice walked across

the railroad right of way and the track single file. At that time William and Alice were living with me. The truck was parked facing the tracks, that is, facing me. Both of them got in the truck and then he got out and stood by the windshield of the car and it looked like he was wiping off the windshield. Then he got back in on the left-hand side of the truck, then he backed out enough so that he could get started in the driveway. Then he started north toward Commercial avenue. When he got onto Commercial avenue he turned to the left and proceeded west toward the crossing. From the time that he started forward with the truck until it got to the crossing the truck did not stop at any time. I would not say the truck was proceeding over five miles an hour. It did not seem to increase or decrease its speed at any time. I mean it was going at an even speed all of that time. After Bill and Alice started backing out I walked across the tracks. When they drove out on Commercial avenue I was on the east side of the tracks watching them. I crossed the tracks because my dog followed them over there and I went to see if I could get the dog. On the crossing the truck was struck by a Chicago & North Western train. Before it struck the truck I saw the train a short distance away, a couple of hundred feet, maybe a little more than that. That is when I heard the train. When I looked up and saw the train the truck was approaching the crossing, and had not quite reached the wigwag there yet; just about on the first track. The wigwag was working. Exhibit 14 shows the driveway out of which the truck drove and then turned left to go along Commercial avenue to the railroad tracks. At the point where you come onto Commercial avenue you cannot see very far at first but after you get closer you can see very good. You cannot see as far as the Sherman avenue crossing.

Harold Gilson, the locomotive fireman on the train in question, was the only other surviving eyewitness. He testified in substance as follows:

In my estimation when I first saw the truck it was from eighty to ninety feet from the crossing. The truck was traveling slow and I estimated the speed between fifteen and twenty miles an hour. I continued to watch the truck. When the truck passed the wigwag signal I realized then that it wasn't going to stop. At that time it was too late to take any action. I merely let a yell out of me and jumped down on the deck. When I saw the truck there before it reached the wigwag signal I certainly did expect it would stop. The bell was ringing, it was turned on about the whistling post for Sherman avenue. It rang until after the engine came to a stop. I observed the wigwag on the left or my side of the engine as I came down Commercial avenue. The wigwag was in operation and the light was flashing. I said I first saw the truck when I was approximately four hundred feet from the crossing. It is my estimation that the truck at that time was eighty to ninety feet from the crossing. It proceeded at an even speed to the crossing. I thought after the truck passed the signal that it increased speed. It looked like to me that it did. I couldn't see it slow down. I watched it all the time. When I first saw it it was eighty to ninety feet from the crossing. I didn't say it was going from fifteen to twenty miles an hour. I think I said ten to fifteen. When I first saw the truck it was on Commercial avenue on the concrete, moving in a westerly direction. I didn't see it in the roundhouse parking lot.

From the testimony it appears that the wigwag when trains were approaching displayed a red light, the bell was rung, and the wigwag operated. There was also testimony to the effect that the wigwag at times operated when trains were not approaching but after trains had passed. At the time in question the speed of the truck was variously estimated at from five to fifteen miles an hour. The most reliable estimate is that of the witness Riley,—five miles per hour. The speed of the train was estimated at from twenty to seventy miles an

hour, the credible testimony being that it was between forty and fifty miles per hour. The locomotive bell was sounded continuously while approaching the crossing but the whistle was not blown.

Reference has been made to Exhibit 14, which is reproduced herewith. The camera stood one hundred ten feet south of the south edge of Commercial avenue, facing north toward the direction from which the train came. From the point where the camera stood and from which Thompson and his wife started, the signal bridge which is seven hundred ninety-two feet north of Commercial avenue can be plainly seen. The second signal bridge is approximately two thousand feet north, and it can be seen. After Thompson had reached Commercial avenue and turned west his view was obscured for a short distance, but as appears from Exhibit 18, from a point some one hundred feet east of the point of collision there was practically an unobstructed view at the time of the occurrence of the accident. The camera was one hundred feet east of the center of the crossing facing northwest in the direction from which the train came. The train north of the crossing is six hundred feet from the crossing.

It is certain that the driver of the truck did not stop, look, or listen, and drove onto the railway track recklessly without any regard to the dangerous situation in which he had placed himself and his wife. The jury found that the whistle was not blown for the crossing. Upon this point the court instructed the jury that sec. 192.29 (4), Stats., is applicable. The material part provides:

"No railroad train or locomotive shall run over any public-traveled grade highway crossing outside of the limits of municipalities unless the whistle shall be blown eighty rods from such crossing and the engine bell rung continuously from thence until such crossing be reached. . . ."

Sub. (4) does not apply to the facts of this case for the reason that this crossing is not outside of the limits of a mu-

nicipality. It is partly inside and partly outside. It is not outside. It was plainly intended to apply to railway crossings in the country. The statute not being applicable, the trainmen under the circumstances were under no duty to turn on the whistle.

Assuming that the defendant Railway Company was negligent it is considered that this case is ruled by *Bellrichard v. Chicago & N. W. R. Co.* (1945), 247 Wis. 569, 20 N. W. (2d) 710; *Waitkus v. Chicago & N. W. R. Co.* (1931), 204 Wis. 566, 236 N. W. 531, 237 N. W. 259; *Van Dunk v. Chicago & N. W. R. Co.* (1926), 188 Wis. 476, 206 N. W. 852; *Wilmet v. Chicago & N. W. R. Co.* (1940), 233 Wis. 335, 289 N. W. 815; *Brager v. Milwaukee E. R. & L. Co.* (1936), 220 Wis. 65, 264 N. W. 733.

The facts in this case closely resemble the facts in *Wilmet v. Chicago & N. W. R. Co., supra.* In that case Smet drove easterly out of the alley back of his home to a public way known as Carabin lane. As the car turned into Carabin lane it was one hundred ninety feet from the center of the crossing on Main street. From that time until the accident occurred the automobile apparently moved forward at a uniform rate of speed of from fifteen to twenty miles an hour. The undisputed testimony is that the car did not slacken its speed before it was struck. In that case, as in this, the wigwag was working. The car made no stop either for the arterial or the railroad crossing. As Smet was approaching the crossing the railroad train was approaching it from the south. The trial court held that the negligence of Smet, the driver of the automobile, was the sole legal cause of the collision, and therefore of the injuries sustained by the plaintiff. In that case, as in this, no claim can be made that the defendant Railway Company might or should have discovered that the deceased persons intended to drive onto the crossing prior to the instant when they passed the wigwag signal.

It is considered that under the doctrine of the cases cited the failure of the driver of the truck to observe the approach of defendant's train, to heed the warning of the wigwag which was in motion with bell ringing and light displayed, was under the circumstances of this case the sole legal cause of the collision and the resulting damage. When it appeared to the fireman that the truck was not going to stop at the crossing, as it was required to do under the law, it was then too late for the trainmen to take effective action to prevent the collision. That would have been the case whether the train was going fifteen miles an hour or fifty, or any intermediate speed.

An attempt is made to excuse the failure of Thompson, the driver, to heed the warning of the wigwag, the light, and the bell, because it sometimes rang for a considerable period after trains had passed over the electrical connections. Just how this could excuse Thompson from making an observation to ascertain whether there was an approaching train we do not see. Even if there was no wigwag it was his duty to observe whether or not a train was approaching the crossing, and to stop, look, and listen before he attempted to proceed. *Keegan v. Chicago, M., St. P. & P. R. Co.* (1947), 251 Wis. 7, 27 N. W. (2d) 739.

The testimony of Mr. Riley, which is uncontradicted, is that the truck never changed its speed from the time it started out of the parking place until it was struck by the train. The only inference that can be drawn from that fact is that he never saw or heard the train. It is apparent that if he had looked he would have stopped.

The conclusion which we have reached in this case makes it unnecessary for us to consider other questions raised on the appeal.

*By the Court.*—In the Alice R. Thompson case the judgment in favor of the plaintiff administrator and against the Railroad Company is reversed with directions to dismiss the

plaintiff's complaint. The motion of the administrator of the Alice R. Thompson estate for review is denied, as is that of the defendant American Casualty Company. In the William Allen Thompson case the judgment in favor of the defendant and against the administrator is affirmed.